UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL A. VEGA, as administrator of Estate of PAUL AARON FRENCH, and on behalf of, DIXIE VEGA, minor G.L.F., and the ESTATE OF PAUL AARON FRENCH and PAUL AARON FRENCH'S heirs-at-law; and DIXIE VEGA, individually, | § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| DALLAS COUNTY, TEXAS; and STEFAN DESHAY ROSS, | § § § | JURY DEMANDED |
| Defendants. | § § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **This is a case of the preventable death of severely mentally ill 31-year-old Paul Aaron French in the Dallas County jail.**



## Table of Contents

I.      Introductory Allegations ........................................................................................3
        A.      Parties.......................................................................................................3
        B.      Jurisdiction and Venue ............................................................................5
II.     Factual Allegations .................................................................................................5
        A.      Introduction..............................................................................................5
        B.      Paul's Predictable Suffering and Death in Dallas County Jail ...............6
                1.      Introduction..................................................................................6
                2.      Paul's Prior Incarceration in the Dallas County Jail....................6
                3.      Paul's Final Incarceration in the Dallas County Jail....................8
                4.      Witness Statements ....................................................................17
                        a.      Barney, Shakita - Detective ..........................................17
                        b.      Loboda, C. – Detective ..................................................20
                        c.      Stockton, Douglas - Sergeant.........................................21
                        d.      Trout, Terry - Detective .................................................21
                5.      Internal Affairs Investigation ....................................................22
                6.      Death Reports.............................................................................26
                        a.      Autopsy Report ..............................................................26
                        b.      Custodial Death Report (Filed with Attorney General)...........29
                        c.      Inmate Death Report (Filed with Texas Commission on Jail Standards) ...............................................................29
        C.      Texas Commission on Jail Standards Investigation................................30
        D.      Defendants' Knowledge and Education..................................................31
                1.      Jail Suicides are a Known, Widespread Problem. ......................31
                2.      Fifth Circuit's Long-Held Constitutional Standard:  Continuous Observation and Monitoring ....................................................31
        E.      Liability of the County ..........................................................................33
                1.      Introduction................................................................................33
                2.      County Policies, Practices, and Customs ...................................34
                3.      TCJS Records Demonstrating County Practices and/or Customs .......42
                4.      Newspaper Articles Regarding County Practices and/or Customs......47
                5.      Prior Deaths at the County Jail .................................................50
III.    Causes of Action ..................................................................................................62
        A.      14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ....................62
        B.      Remedies for Violation of Constitutional Rights..................................63
        C.      Cause of Action Against Stefan Ross Under 42 U.S.C. § 1983 for Violation of Constitutional Rights .....................................................64
        D.      Cause of Action Against the County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ...............................................68
IV.     Concluding Allegations and Prayer .....................................................................70
        A.      Conditions Precedent..............................................................................70
        B.      Use of Documents at Trial or Pretrial Proceedings ...............................70
        C.      Jury Demand ...........................................................................................70
        D.      Prayer ......................................................................................................71

TO THE HONORABLE UNITED STATES DISTRICT COURT:

    Plaintiffs file this complaint and for cause of action will show the following.

I.    <u>Introductory Allegations</u>

    A.    <u>Parties</u>

    1.    Plaintiff Michael A. Vega ("Mr. Vega") is a natural person. Dixie Vega ("Ms. Vega") was Paul Aaron French's natural and legal mother. Minor G.L.F. is, upon information and belief, Paul Aaron French's natural and legal daughter. Decedent Paul Aaron French is referred to herein at times as "Paul" or the "decedent." Mr. Vega sues as the Administrator of the Estate of Paul Aaron French, Deceased. Mr. Vega, when asserting claims in this lawsuit as the administrator, does so in that capacity on behalf of all wrongful death beneficiaries (including Ms. Vega and minor G.L.F.), and he seeks all wrongful death damages available to those persons. Those wrongful death beneficiaries are collectively referred to herein as the "Wrongful Death Beneficiaries." Mr. Vega also does so in that capacity asserting claims on behalf of the estate and all of Paul's heir(s) (including Paul's heirs-at-law, including, upon information and belief, G.L.F.). Those heirs are collectively referred to herein as the "Claimant Heirs." Mr. Vega asserts claims on behalf of and seeks all survival damages and wrongful death damages available to Claimant Heirs and Wrongful Death Beneficiaries, to the extent allowed by law. Ms. Vega also sues in her individual capacity and seeks all wrongful death damages available to her. Mr. Vega qualified as estate administrator in or about December 2022, in Cause Number PB1-0894-2022, in the Probate Court of Collin County, Texas, in a case styled *Estate of Paul Aaron French, Deceased.*

    2.    Defendant Dallas County, Texas ("Dallas County" or the "County") is a Texas county. Dallas County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Clay Jenkins, at 500 Elm

Street, Suite 7000, Dallas, Texas 75202, or wherever Honorable County Judge Clay Jenkins may be found. Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). The County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983). Plaintiffs are not required to allege at the pleadings stage the County's chief policymaker. Moreover, to the extent necessary, Plaintiffs allege that the County may have delegated relevant policymaking authority to one or more individuals, including but not necessarily limited to County Sheriff. The County's policies, practices, and/or customs were moving forces behind and caused, were proximate causes of, and were producing causes of constitutional violations and resulting damages (including death) referenced in this pleading.

      3.      Defendant Stefan Deshay Ross (sometimes referred to herein as "Mr. Ross," "Jailer Ross," or "DTO Ross") is a natural person who resides and is domiciled in Texas. Stefan Deshay Ross may be served with process at 6337 Ashford Trail, Mesquite, Texas 75181. He may also be served at his, upon information and belief, work address, Dallas County Jail, 111 West Commerce Street, Dallas, Texas 75202. He may also be served with process wherever else he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Ross at his dwelling or usual place of abode with someone of suitable age and discretion who resides there. Mr. Ross is being sued in his individual capacity, and he acted at all relevant times under color of state law. His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death

referenced in this pleading.  Mr. Ross was employed by the County at all such times and acted or failed to act in the course and scope of his duties for the County.

B.    Jurisdiction and Venue

4.    The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.

5.    The court has personal jurisdiction over the County because it is a Texas county. The court has personal jurisdiction over Mr. Ross because he resides in, is domiciled in, is a citizen of, and/or has sufficient contacts with Texas.

6.    Venue is proper in the Dallas Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in the County, which is in the Dallas Division of the United States District Court for the Northern District of Texas.

II.    Factual Allegations

A.    Introduction

7.    Plaintiffs provide in factual allegations sections below the general substance of certain factual allegations.  Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claims have facial plausibility.  Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the

specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, Plaintiffs have attempted to do so accurately and without any typographical errors. However, some typographical errors may still exist. Plaintiffs plead facts with give rise to conditions of confinement and/or episodic acts and/or omissions claims, as appropriate, and ask that the court apply the correct legal theory or theories to the facts plead. Plaintiffs are not pleading their "best case" and will only be able to do so after conducting discovery. Plaintiffs do not intend to "stand" on this pleading but will seek leave to amend as further facts are developed, or in the event any court determines that Plaintiffs' live pleading is any manner deficient.

B.    Paul's Predictable Suffering and Death in Dallas County Jail

1.    Introduction

8.    Paul experienced entirely predictable and unnecessary suffering and death in the Dallas County jail. Paul was the victim of severe mental illness, which went unmedicated for extensive periods of time, when he was in the care of Dallas County. He ultimately died by suicide and/or as a result of actions he took related to his mental illness. Paul's death occurred in a jail that has been particularly troubled of-late, and some of its problems have been well-documented through local media outlets.

2.    Paul's Prior Incarceration in the Dallas County Jail

9.    Dallas County's knowledge of Paul's suicidal and psychotic tendencies extended as far back as at least April 2018, during an incarceration preceding the incarceration concluding in his death. On April 20, 2018, Paul was on suicide precautions in the Dallas County Jail. He was

acting erratically and agitated, and banging on the light protector in his cell. Jailers restrained Paul's wrists, ankles, and torso to prevent self-harm.

10.    Paul was assessed the same day for complaints of suicidal ideation. He said that he was suicidal, and he acted aggressively.  He was also combative and agitated. He hit a wall with his fist, he and was harmful to himself and others. Jailers had to restrain him for a second time that day due to his erratic behavior. Ativan was administered intramuscularly. Paul then flooded his cell. Suicidal precautions started and continued.  Upon information and belief, the County knew that these issues were as a result of Paul's severe mental illness.  Moreover, intramuscular administration of Ativan demonstrated that the County knew that it could involuntarily administer medications when legal and appropriate.

11.    On April 21, 2018, Paul was combative with jail staff while being strapped into a restraint chair. Paul was seen kneeling on the floor, crying, and speaking to nonexistent people. Paul had also been talking to himself throughout the night. He also presented with disorganized thought process and recently – endorsed suicidal ideations.

12.    On April 23, 2018, an RN assessed Paul in the jail. As a result, it was determined that Paul had paranoid delusions.

13.    On June 1, 2018, Paul was examined in the Dallas County Jail. As a result, the jail put Paul on suicide precautions.  Paul was seen repeatedly hitting a cell door with his elbow. Paul had to be restrained once again, and placed on suicide precautions.  Paul was even biting his own arm and chanting to himself.  Photos show a visible injury as a result of Paul biting his arm.

14.    On June 2, 2018, Paul received crisis stabilization care. Paul appeared confused and incoherent, and he had poor hygiene. His admitting diagnosis was self-harm behavior and acute mood disturbance. There was also evidence of actual or potential danger to Paul or others, as

evidenced by a suicide attempt or individual assessed at high suicide risk, and current manifestation of severe aggression and high risk for continuation of violent behavior as a result of a mental disorder.

15.    On June 4, 2018, as a result of a medical evaluation, Paul required emergency medications when demonstrating self-harm behavior.  Paul had symptoms of depression and psychosis. On mental status examination, Paul appeared disheveled. He had poor eye contact, impaired insight, poor judgment, and was uncooperative.  Paul had a history of depression, and he was assessed to be having psychosis.

16.    A physician noted that Paul might need a competency evaluation and then court-ordered medications. He had a depressive disorder, by history, and a history of polysubstance dependence. Paul was also paranoid and guarded.  Once again, the physician's determination that Paul might need to be declared incompetent and receive court-ordered medication indicated Dallas County's knowledge that such could occur.  This knowledge is vitally important, as it related to Paul's final incarceration in the Dallas County jail.

17.    On July 3, 2018, Paul was examined in the Dallas County Jail as a result of difficulty sleeping and hearing voices that were nonexistent. Paul occasionally had hallucinations in the evening when he was attempting to go to sleep.  Paul was diagnosed with unspecified psychosis.

### 3.    Paul's Final Incarceration in the Dallas County Jail

18.    Paul was arrested on or about March 6th, 2020. Paul's grandmother saw that Paul was sleeping on the front porch of her residence. Paul's grandmother called Paul's mother, because Paul's grandmother wanted Paul removed from her property due to his mental illness/mental health

issues. Paul's family wanted to get help for Paul, not for him to be arrested, needlessly suffer, and die in the County jail.

19.     Therefore, Paul's mother called authorities about the situation. Uniformed police officers appeared at the residence, and through a number of occurrences, pursued and arrested Paul. Paul thereafter became a pretrial detainee at the Dallas County jail. An arresting officer indicated that, while attempting to detain and subdue Paul, the male arresting officer struck Paul in his head and face, using the officer's right fist, approximately 10 times. Upon information and belief, this could have resulted in a concussion and or other traumatic brain injuries which exacerbated Paul's preexisting serious mental health issues.

20.     On March 7 2020, Paul was assessed by a jail nurse. Paul was hearing non-existent voices and seeing things that were not there.

21.     On June 5, 2020, a judge sitting for the 282nd District Court, in Dallas County, Texas, in a pending criminal case against Paul, signed "Judgment (Uncontested - Incompetent to Stand Trial; In-Patient Mental Health Services)." The court determined in that judgment that evidence existed to support a finding that Paul was incompetent, and that attorneys for both Paul and the State agreed that Paul was incompetent to stand trial. In fact, they determined that no hearing was necessary. As a result, the court ordered that Paul was to be committed to an inpatient mental health facility designated by North Texas State Hospital. Paul's commitment would be for a period not to exceed 120 days from the date he would be admitted to the facility, and the purpose of that commitment would be for further examination and treatment toward the specific objective of Paul attaining competency to stand trial. Paul was remanded to the custody of Dallas County only "for transportation to the designated facility." The court further ordered that a copy of the judgment along with reports of psychiatric, psychological, and or social work experts accompany

Paul to the mental health facility. However, instead of transporting Paul to such a mental health facility, Dallas County chose to incarcerate Paul for months. At the time of his death, he had been incarcerated in the Dallas County Jail for over six months. If Paul had not died, he would have no doubt been incarcerated in the Dallas County jail for some unknown, non-specified period of time, all while being incompetent, suffering delusions, hearing voices that were not real, seeing people who were not there, and attempting to kill himself. This violated the County's obligation to protect and not punish Paul, as a pre-trial detainee.

22.    As Paul continued to be incarcerated in the Dallas County jail, and not receive treatment in an in-patient mental health facility, on August 16, 2020, Paul was assessed for major depressive disorder. Jailers assigned to Paul's floor reported that Paul was acting strangely.

23.    On September 3, 2020, Paul was assessed for behavior concerns by a nurse and a nurse practitioner in the jail. Paul had difficulty sleeping, and his mother had said that Paul had obsessive-compulsive disorder. Jailers noted that Paul was constantly punching the air, running up and down the jail pod, talking to himself, and trying to steal from others. Paul also "stared (at) the nurse in a scary way." Paul had to be transferred to a crisis stabilization program.

24.    A September 4, 2020 medical record entry confirmed that Paul had been found incompetent. Paul had been evaluated by a psychiatrist, and placed on psychotropic medications on August 26, 2020. A note of the same day also indicated that Paul had been declared incompetent to stand trial, such declaration being by a Dr. Pitman.

25.    Paul was diagnosed with schizoaffective disorder. He was "advised" to increase his current dosage of Zyprexa and gradually taper his Depakote prescription. This was an idiotic instruction, as Paul was not even competent and could not meaningfully converse with and receive informed consent from healthcare providers.

26.    On September 7, 2020, Paul was examined by an RN for "weird behavior." Paul would wander in the jail tank and grab constantly in the air. Paul was advised to go to crisis stabilization and suicide precautions due to his bizarre behavior.  Thus, while Paul continued to be psychotic and exhibit severe mental health issues, Dallas County failed and refused to transfer him for needed mental health care in accordance with the court order referenced above.

27.    On September 9, 10, and 12 2020, Paul "no-showed" for his medications. These medications included Zyprexa.  Zyprexa, also known as Olanzapine, is used to treat certain mental/mood conditions.   These conditions include schizophrenia and bipolar disorder. Zyprexa/Olanzapine can also be used in combination with other medications to treat depression. Zyprexa can help to decrease hallucinations and assist a person in thinking more clearly and positively about himself, feel less agitated, and take a more active part in everyday life.

28.    On September 16, 22, and 25, 2020, Paul refused all lab testing. On October 15, 16, 17, and 20, 2020, Paul refused his medications, including Zyprexa. On October 26, 27, and 28, Paul again refused his medications. Paul continued refusing his medications on October 31, 2020 and November 1, 2, 4, 5, 9, 10, 13, 14, 16, and 18, 2020.  Upon information and belief, these were needed mental health medications.  Even so, and even though Paul was in a psychotic and delusional state, Dallas County failed to obtain an order for forced medications.  It thus failed to provide needed medical and mental health care, and unconstitutionally failed to protect and instead punished Paul.

29.    A November 19, 2020 note indicated that Paul had a suicide risk assessment with a licensed professional counselor. A note indicated that Paul was taking psychotropic medications. However, jail records indicated that Paul was non-compliant with his medication regimen. Records

also indicated that Paul had been diagnosed with schizoaffective disorder. Paul was unable to help himself, and the County was taking no action to assure that Paul received needed medication.

30.     Moreover, the counselor noted that since Paul had been in jail, since March 7 2020, his suicide ideation was not as a result of any substance abuse or dependence factors. This indicated, upon information and belief, that Paul's issues were clearly as a result of his serious mental health problems. They were physiological.

31.     On November 23, 2020, Paul once again refused his morning medications. He was examined the same day by a physician for schizoaffective disorder and bipolar disorder. Paul was screaming loudly, threatening the psychiatrist, and trying to attack the doctor through a glass door. Paul was agitated for no identifiable reason. The interview had to be terminated. Paul continued refusing medications, including on November 25, 2020.

32.     A note indicated that, as of November 25, 2020, Paul's "level of insight into illness and situation was poor." This was no surprise for someone who was incompetent. Continued incarceration of Paul without forced medications, and any chance of him becoming competent, constituted at least unconstitutional punishment. Paul once again refused medications on November 25, 26, and 27, 2020.

33.     On November 27 2020, at 5:00 p.m., Paul was assessed by a nurse practitioner for suicidal ideation and schizoaffective disorder. Paul was naked and lying on the cell floor, and he said that he wanted to kill himself. Paul also said that he had a suicide plan, although he did not reveal specifics. Paul was transferred to "suicidal" housing. Paul also told a nurse that he was suicidal and overeating. Upon information and belief, pursuant to County policy, practice, and/or custom, the County did nothing about his "overeating" [or substantively excess drinking] claim.

34.     On November 29, 2020, Paul again refused to take evening medications. As with many other times, according to records, "he was called for three times and did not show for the treatment." Paul also refused medications on December 1, 2, 3, and 4, 2020.  There was little doubt that, if this continued, it would lead to serious injury or death.

35.     On December 5, 2020, at 9:04 a.m., a licensed professional counselor conducted "an evidence-based suicide risk assessment" of Paul.  Paul did not answer any of the assessor's questions, but only mumbled in response.  Paul had been sleeping on the floor of his cell, and he stayed on the cell floor after he was awakened.  Paul's thought process was disorganized, and he did not appear to be responding to internal stimuli.  Medical records also showed that Paul had not been compliant with his medication regimen.  The counselor noted that Paul had been put on suicide precautions for the third time in just the previous few weeks.  There were plenty of warning bells that should be going off, but Paul was stuck in the midst of inaction pursuant to County policy, practice, and/or custom.

36.     Paul was also considered to be an "unreliable reporter" regarding his situation.  This was not surprising to anyone involved, as Paul was incompetent.  The counselor noted that Paul "might benefit" from being monitored on suicide precautions to ensure his safety. Paul was also assessed to have a high chronic suicide risk. The fact that he was a high "chronic" suicide risk indicated the ongoing likelihood that Paul would make another suicide attempt.  Paul refused his medications on December 5, 6, and 7, 2020.  Once again, this was not an "informed consent" refusal.  Paul was incompetent, and thus could not consent or fail to consent, even if he were informed of the purported medication benefits.

37.     Records for December 7, 2020 indicate that a licensed professional counselor met with Paul for suicide precautions. Paul stated that he was suicidal. He then said that he was finished talking, said, "Bye," and covered his face with a blanket.

38.     The counselor said that Paul would be placed on suicide watch, and his clothes taken from him due to active suicidal ideation. The note further indicated that suicide precautions were started/continued because Paul was having active suicidal thoughts and plans.

39.     On December 8, 2020, at 12:02 a.m., a physician assessed Paul. Paul was naked and did not engage with the physician. It was apparently only then, essentially the last day of Paul's life, that a physician planned to file a compelled medications application. Unfortunately, this was far too late for Paul. This should have been done long before, and if so, upon information and belief, Paul's life would have been saved.  Plaintiffs do not complain about the adequacy of medical care or medical judgment.  Instead, Plaintiffs complain in part about a wholesale lack of provision of needed medical care required to attempt to restore Paul to competency.  The County knew that Paul was incompetent and thus unable to care for himself.  The County, on numerous occasions, pursuant to, upon information and belief, policy, practice, and/or custom, simply allowed Paul to refuse medications at will.  The County took no action for weeks, which was consistent with the conditions in which it confined all those in its jail with serious mental health issues.  The County, in allowing Paul to refuse medication, sanctioned provision of him receiving no needed medical care.

40.     On December 8, 2020, Paul was also strapped into a restraint chair. A restraint chair generally contains straps and belts used to secure a person's arms, legs, and torso, keeping the person in an upright seated position in the chair.  This was as a result of Paul saying that he was suicidal, and then attempting to sever his penis from his body by violently pulling on it. Paul also

had a wound on his wrist, and he was seen putting fecal material into the wound. Paul was seen standing nude at the toilet, and bent over behind a partition wall at the sink.  Paul was thus demonstrating bizarre behavior well beyond the pale.

41.     On the same day, at 10:20 a.m., a physician examined Paul for his "disorganized behavior."  Paul was in his cell, lying on the floor, naked, and not verbal.  He was not responding to internal stimuli.  He was restless, withdrawn, not making any eye contact, and not processing any information asked of him.  Paul had poor judgment, hygiene, and grooming. The physician diagnosed Paul with schizophrenia.  Paul was grossly psychotic, grossly disorganized in behavior, mute, and not responding to environmental but rather responding to internal stimuli. He was viewed as being at a risk of harming himself unless he was medicated involuntarily.  This was clear and apparent to all laypeople working in the jail, weeks and months before.  One needed no medical professional determination to know that Paul needed his mental health medications.  One likewise needed no medical expertise to see that Paul deteriorated to a shell of a human being without those medications.  Even so, the County failed and refused to assure that such medications were administered.  When someone finally acted, it was too late for Paul.

42.     On December 8, 2020, at 5:56 p.m., Paul was in his tank sleeping, not responding to his name, and snoring loudly.  He was found on the floor naked, with urine all around his room. They could not check his blood pressure because of "rigorous movement." Paul again refused medications that day at 8:48 p.m.

43.     On the same day, at approximately 11:04 p.m., a nurse practitioner examined Paul after he was found unresponsive. Paul had been noted to be unresponsive at 9:19 p.m. At 9:22 p.m., nurses responded to Paul's cell and saw white foam coming out of Paul's mouth. Paul's heart rate was 172, and his oxygen saturation was only 94.

44.     Dallas County jail medical records for Paul indicate a number of things, would show, upon information belief, common knowledge of Defendants and others in the jail about Paul's serious mental health issues. Paul had been prescribed Depakote. Depakote can be prescribed to treat complex partial seizures. It is also a prescription add-on medication for acute bipolar mania.

45.     Paul was clearly bipolar, diagnosed as such, and which was communicated to the Dallas County jail.  The Olanzapine which had been prescribed to Paul is, as indicated elsewhere in this pleading, prescribed to treat symptoms of schizophrenia. Schizophrenia is a mental illness that causes disturbed or unusual thinking, loss of interest in life, and inappropriate or strong emotions in adults.  Olanzapine is also used to treat bipolar disorder. Bipolar disorder is manic depressive disorder, which is a disease that causes episodes of depression, episodes of mania, and other abnormal moods.

46.     Paul was also diagnosed with asthma. He was prescribed medication as necessary for wheezing and breathing issues (shortness of breath).  One note summed up what is otherwise referenced in this pleading. That note indicated that Paul was receiving psychotropic medication in the jail. However, Paul had been non-compliant with the medication regimen. This was noted generally in a November 19, 2020 record. The note moreover indicated that Paul had been diagnosed with schizoaffective disorder. Moreover, the "AIS record shows Mr. French has been found incompetent."  A note, far too late to help Paul, dated December 8, 2020, read that Paul was seen at cell side, naked, and not engaging. The note also said, "We will file compelled meds application."  Paul was thereafter found unresponsive in his cell, and he died as described elsewhere in this pleading.

4.    Witness Statements

47.    Plaintiffs list in this section of the complaint relevant summaries of some material portions of witness statements, and/or statements made in government documents and/or reports, provided by some individuals.  Plaintiffs intend that information in this section of the pleading, along with all other information in this pleading, support and give notice of plausibility of Plaintiffs' claims.

a.    Barney, Shakita - Detective

48.    Dallas County Detective Shakita Barney provided a report/statement regarding Paul's death. She noted that the investigation was also to be conducted by the Duncanville Police Department.  Upon information and belief, this would occur as a result of requirements imposed by the Sandra Bland Act.

49.    Detective Barney wrote that, on December 8, 2020, Dallas County Sheriff's Department Detention Training Officer (DTO) Stefan Ross was assigned to monitor the crisis prevention and suicidal jail inmates housed in 3P12 Tank-West Tower, in the jail located on Commerce Street.  Detective Barney wrote that, at approximately 9:16 PM, DTO Ross heard Paul breathing abnormally in the 3P12-B cell.  DTO Ross saw Paul on the floor of the cell, with white foam coming out of his mouth. DTO Ross knocked on the cell door, according to Detective Barney, but Paul was unresponsive. DTO Ross then contacted the third floor control center via intercom, and asked that the door to the cell be opened.  DTO Ross and DSO A. Funches entered the cell and removed Paul.  Paul was ultimately transported to Parkland Hospital in Dallas.

50.    Detective Barney accompanied Detective Loboda to Parkland Hospital, and she was also present when Detective Loboda questioned others at the Dallas County jail regarding Paul's death. When Detective Barney and Detective Loboda arrived at the West Tower Detention Facility, after returning from Parkland Hospital, they spoke with Detention Service Supervisor

(DSS) Volmert and DSS C. Fritz (#7830). DSS Volmert and DSS Fritz told Detectives Barney and Loboda that Paul was on suicide watch, and that he had been restrained in a restraint chair earlier the day that he was found unresponsive. They said he was restrained in a restraint chair "after he attempted to detach his penis from his body and for pushing objects into his penis after he made the statement, 'I want to commit suicide.'"

51.    Detective Barney also wrote that she contacted the Dallas County District Attorney's Office, Assistant District Attorney George Lewis, and Duncanville Police Department Lieutenant Chris McCaleb and told them about Paul's death. Detective Barney reviewed surveillance video for cell 3P12 from December 7th, 2020, beginning at 10:00 PM, through December 9th, 2020, ending at 2:00 AM. Detective Barney saw that, on December 7th, 2020, at approximately 11:04 PM, Paul got up from the bunk in his cell and bent over at the waist, remaining in that position until 11:05 PM. Paul then laid back down on his bunk, but he continued to get up and walk to the toilet area behind a partial petition, walk back to his bunk, bend over at the waist, and sit on the bunk looking through the cell window. Upon information belief, jailers could easily look into the cell window and see what Paul was doing.

52.    Detective Barney also saw, when reviewing video recordings, that on December 8th, 2020, at approximately 2:08 AM, Paul got up from his bunk and walked to the toilet area and stood behind the partial petition. He appeared to be bent over at the waist/sitting on the toilet with his knees on top of the toilet bowl. He walked away from the toilet area at approximately 2:19 AM and toward the door of his cell. As he was walking toward his cell door, he appeared to have his hand on his penis. At approximately 2:24 AM, Paul was standing up against his cell wall with his hands on his penis, as several DSOs were waiting to enter Paul's cell. At approximately 2:30 AM, jailers removed Paul from the cell and strapped him into a restraint chair. The detective noted that,

according to Adult Information System (AIS) incident report W2005363, Paul was strapped into a restraint chair because he was attempting to detach his penis from his body and was pushing objects into his penis.

53.     Detective Barney noted that restraints on the chair were checked only at 2:35 AM. The detective also noted that Paul was removed from the restraint chair at 4:28 AM. If in fact no additional checks were conducted, this was a violation of all known jail standards, as well as minimum standards promulgated by the Texas Commission on Jail Standards.

54.     It appears that jailers failed to continue to monitor Paul, even though he was suicidal and attempting to seriously mutilate himself. After removal from the restraint chair, from approximately 4:28 AM to 6:17 AM, Paul constantly moved from his bunk to the toilet area behind the partial partition. At approximately 10:28 AM, a medical staff member and four jailers went to Paul's cell. Paul was then moved from cell 3P12-D to 3P12-B due to Paul attempting to flood the cell. When Paul was moved to cell 3P12-B, he was on the floor and out of view of the surveillance camera. This violated all known jail standards, for a person in Paul's situation. However, it appeared to be consistent with custom and practice in the jail.

55.     At approximately 1:10 PM, jail medical staff and two jailers entered Paul's cell for what appeared to be an evaluation. This occurred again at approximately 5:43 PM. When the door to Paul's cell was open, he could be seen laying on the floor, naked, in a fetal position. Detective Barney "was unable to observe any movement from [Paul] during that time." Detective Barney then saw that, at approximately 9:19 PM, two jailers entered Paul's cell and removed him from the cell. Two more jailers came to the cell at approximately 9:21 PM, and medical staff arrived at approximately 9:22 PM. Approximately 21 minutes later, jail medical staff began administering CPR.

56.     Detective Barney conducted at least three recorded interviews, one with DSO D. Smart, one with DSO D. Brown, and one with DTO Ross. These interviews occurred in the CIS office. Detective Barney also indicated that she obtained Paul's full medical records and saw two medical evaluations that Paul had received before his death that were originally missing from the Dallas County jail packet.

b.     Loboda, C. – Detective

57.     Dallas County Detective C. Loboda (#1013) (DSO/PES) wrote a report/statement related to Paul's death. He wrote that he was dispatched for a sick inmate call in the West Tower Jail at 111 West Commerce in Dallas. Jail supervisor Volmert told Detective Loboda that Paul had been transported to Parkland Hospital, while CPR was being conducted, and while medical professionals were attempting to intubate Paul. A Doctor Busse told Detective Loboda that medical professionals were not able to gain a pulse from Paul. He was thus pronounced deceased at 10:55 PM on December 8, 2020.  Dr. Busse noted, when Paul arrived in room L3 at Parkland Hospital, that Paul was aspirating from his mouth.  Detective Loboda took photographs of Paul, after he was deceased.

58.     Detective Loboda then traveled to the West Tower, at the Dallas County Jail, and spoke with DSS Volmert and DSS Fritz (DSO/jail supervisor). Detective Loboda was told that Paul was on suicide watch and "was discovered while making rounds and appeared to have labored breathing." Detective Loboda was further told that Paul was placed on suicide watch "after trying to place things inside his penis and then rip his penis off." He was also told that Paul was placed into a restraint chair earlier that day, and "that [Paul] has a history of behavior like this." Detective Loboda was also told, "French had been placed on suicide watch several times in the past."

c.    Stockton, Douglas - Sergeant

59.    Dallas County Sergeant Douglas Stockton (#6460) provided a statement related to Paul's death. He wrote that, while working a crisis/suicide housing location, such as that in which Paul was incarcerated, Dallas County jailers are expected to visually verify the wellbeing of inmates no less often than once each 15 minutes. They need to be certain that the inmate under their custody is responsive and appears to be in good health. Such officers also have to be present in their assigned location at all times, unless relieved by another jailer for lunch, bathroom breaks, and similar issues.

60.    Sergeant Stockton, while reviewing video related to Paul's death, "noticed that [DTO Ross] was absent from his assigned location for a considerable amount of time. This would be the most grievous error committed by DTO Ross during the incident, but failure to make 15 minute rounds is also a failure on Officer Ross's part."

61.    Sergeant Stockton also noted that Defendant Ross had been a detention training officer for several years and was thus well aware of what was expected of him when he was working a "crisis/suicide location." Sergeant Stockton's statement also indicated that Defendant Ross was relied on heavily by shift supervisors. Thus, upon information and belief, DTO Ross was merely engaging in actions which were the custom and practice at the Dallas County Jail.

d.    Trout, Terry - Detective

62.    Dallas County Detective Terry Trout wrote a supplemental report regarding Paul's death. He noted that Paul had been transported to Parkland Hospital, where he was pronounced deceased, and where Dallas County Sheriff's Department physical evidence section Detective C. Loboda (#1013) and Detective Barney responded. Detective Trout facilitated notifying Dixie Vega of her son's death.

5.    Internal Affairs Investigation

63.    The Dallas County Sheriff's Department conducted an internal affairs investigation regarding DTO Ross.   Sergeant Moore (#5414) was the complainant, and he cited, upon information and belief, policies, procedures, and/or standing orders which indicated that DTO Ross had committed dereliction/neglect of duty and falsified reports. Sergeant Moore typed into the report, "DSO Ross not making face to face rounds which resulted in a custodial death. Also falsified rounds in the round book." After an investigation, these charges were "sustained." As a result of DTO Ross's dereliction of duty, untruthfulness, and falsification vacation of rounds, in which he alleged that he made checks of Paul which he did not make, DTO Ross received only three days off without pay. This "slap on the wrist" for charges that DTO Ross was not making appropriate rounds "resulting in" Paul's death, and likewise falsifying observation records, is some evidence of pre-existing practice and custom of not making cell observations when required.  That Dallas County would continue to employ such a person is further evidence of pre-existing practice and custom of not making cell observations when required.

64.    The internal affairs ("IA") investigation included a review of numerous issues regarding Paul's incarceration.  A handwritten note by, upon information and belief an internal affairs investigator, indicated that there were 17 jail incidents involving Paul, 10 of which were for crisis or suicidal tendencies.

65.    Internal affairs investigation records indicate that Defendant Ross did not conduct proper 15-minute face-to-face checks of Paul as required by written procedures. Defendant Ross did not make such face-to-face checks, on the day that Paul was found, nearly deceased, at 2:00 PM, 2:15 PM, 2:30 PM, 2:45 PM, 3:00 PM, 4:00 PM, 6:00 PM, 6:15 PM, 6:30 PM, 6:45 PM, 7:00 PM, 7:15 PM, 7:30 PM, 8:30 PM, 8:45 PM, and 9:00 PM.  Defendant Ross made notations in the

"round book" indicating that he checked Paul, when in fact he did not do so. This occurred on multiple occasions, giving rise to the reasonable inference, considering DTO Ross's lengthy history working for the jail, and the failure of the County to fire him as a result of Paul's death, that his actions and inaction were consistent with pre-existing custom and practice. In fact, a document containing recommendations from DTO Ross' chain of command, indicated that a sergeant, a lieutenant, and Chief Deputy Robinson recommended that DTO Ross receive only a written reprimand and thus no time off at all.

66.     Findings related to the IA investigation indicate that DTO Ross was assigned to work overtime, 2:30 PM to 10:00 PM, on December 8, 2020. He had worked the same area, 3P12, on the same day, beginning at 5:57 AM. He was thus scheduled to work approximately 16 hours by Dallas County. Upon information and belief, this was due to a failure to appropriately staff the jail.

67.     Defendant Ross admitted that he knew that Paul was behaving oddly. He also said that officers during the first watch told him of Paul attempting to harm himself, and having to be placed into a restraint chair. Upon information and belief, first-watch officers told Defendant Ross that Paul had attempted to sever his penis and insert items into his penis.

68.     Defendant Ross also stated that he knew that the reason that Paul had been moved from D-cell to B-cell was for "better observation." Thus, DTO Ross's decision to falsify observation records, indicating that he made observations of Paul which he did not, was deliberately indifferent to Paul's known serious medical and psychiatric issues.

69.     Defendant Ross also knew that Paul had received an injection which Defendant Ross believed would act as a sedative. Defendant Ross told an investigator that he was concerned about Paul's health due to him not recovering in a significant time after receiving the injection.

This was further evidence that Defendant Ross's decision not to make face-to-face checks of Paul was deliberately indifferent to known serious medical and psychiatric needs.

70.     Attempting to defend himself, Defendant Ross told an internal affairs investigator that the manner in which he allegedly checked on Paul, when falsifying observation records as indicated elsewhere in this complaint, was the common practice for jailers who worked crisis tanks in the jail.

71.     The IA investigation also uncovered, through a review of evidence indicating that rounds had been made, the likely, upon information and belief, custom and practice of not conducting rounds as indicated. Defendant Ross indicated he made rounds at exactly the 15-minute mark each hour. Other records indicate that rounds were made exactly 15 minutes apart, although not on quarter-hour increments. This defies logic, considering human nature. It is highly unlikely, and virtually impossible, that over a number of hours, cell checks would be made at exactly the 15-minute, 30-minute, and 45-minute segments of an hour.

72.     One document flatly indicates that the suicide/crisis watch log completed by Defendant Ross, for Paul, contained complete fabrications. Defendant Ross listed times at which he allegedly conducted face-to-face observations of Paul, when in fact he did not. Defendant Ross also simply "made up" described inmate behavior for Paul.

# Dallas County Jail
## Suicide/Crisis Watch Log

INMATE: French, Paul

BNO #: 2001 1474

DATE /TIME: 12/8/20

SHIFT: 3rd

LOCATION: 3Pod 5P11

DATE PLACED ON S/W: _____

| TIME | OFFICER I.D. # | DESCRIBE INMATE BEHAVIOR |
|------|----------------|--------------------------|
| 2:00 | Russ # 8031 | Laying Down |
| 2:15 | Russ # 8031 | Laying Down |
| 2:30 | Russ # 8131 | Laying Down |
| 2:45 | Russ # 8131 | Laying Down |
| 3:00 | Russ # 8031 | Laying Down |
| 3:15 | Russ # 8091 | Laying Down |
| 3:30 | Russ # 8131 | Laying Down |
| 3:45 | Russ # 8031 | Laying Down |
| 4:00 | Russ # 8131 | Laying Down |
| 4:15 | Russ # 8031 | Laying Down |
| 4:30 | Russ # 8031 | Laying Down |
| 4:45 | Russ # 8131 | Laying Down |
| 5:00 | Russ # 8031 | Laying Down |
| 5:15 | Russ # 8031 | Laying Down |
| 5:30 | Russ # 8031 | Laying Down |
| 5:45 | Russ # 8031 | Laying Down |
| 6:00 | Russ # 8031 | Vital Signs Checked |
| 6:15 | Russ # 8031 | Laying Down |
| 6:30 | Russ # 8031 | Laying Down |
| 6:45 | Russ # 8031 | Laying Down |
| 7:00 | Russ # 8031 | Laying Down |
| 7:15 | Russ # 8031 | Laying Down |
| 7:30 | Russ # 8031 | Laying Down |
| 7:45 | Russ # 8031 | Laying Down |
| 8:00 | Russ # 8031 | Laying Down |
| 8:15 | Russ # 8031 | Laying Down |
| 8:30 | Russ # 8031 | Laying Down |
| 8:45 | Russ # 8031 | Laying Down |
| 9:00 | Russ # 8031 | Laying Down |
| 9:15 | Russ # 8031 | Laying Down |
| 9:16 | Russ 8031 | Inmate Down |
| 9:34 | Russ 8031 | Inmate Down |
| 9:40 | Russ # 8031 | Inmate Down |

DATE/TIME REMOVED FROM OBSERVATION: _____

BY PHYSICIAN: _____

6.     Death Reports

a.     Autopsy Report

73.     The Dallas County Medical Examiner's Office, at the Southwestern Institute of Forensic Sciences at Dallas, conducted an autopsy of Paul. Paul was 5'–9" tall, and he weighed 160 pounds.  The autopsy report listed a number of blunt force injuries, including a one-half inch contusion on the right side of Paul's forehead, a one-inch blue raised contusion, with a surrounding two-inch diameter rim of erythema, on Paul's lateral left eyebrow. Paul's anterior left shoulder had a slightly raised one-inch diameter healing lesion, and the left side of the chest had a one-half-inch diameter red contusion. The lateral left side of Paul's chest had a one-half-inch diameter red/purple contusion, while his anterior left hip had a two-inch diameter green contusion. Paul's anterior right arm had a one-quarter-inch blue contusion, and his lateral distal right forearm and right wrist had several, up to one-half-inch, diameter crusted areas of ulceration. His posterior right hand had a one-inch diameter pink-blue contusion, and his anterior left arm had a one-half-inch red/purple contusion.

74.     Paul's lateral left wrist had a one-and-one-half inch diameter red contusion, while his posterior left hand had two quarter-inch purple contusions. Paul's distal posterior left thigh had a one-half-inch abrasion, and Paul had red contusions, measuring up to an inch in diameter, on his anterior left knee and lateral proximal left leg. Paul's lateral left ankle and posterior left foot had up to two-inch diameter red/purple contusions, while his anterior right knee had a one-quarter-inch abrasion and a one-quarter-inch contusion.

75.     The Medical Examiner's Office reviewed various forms of evidence to assist in coming to a conclusion as to the manner and cause of Paul's death. This included review of jail surveillance video for December 8, 2020. The video showed Paul alone in a single-occupancy cell,

with a direct view of the sink/toilet unit (STU) obstructed.  The autopsy report listed a number of events including the following:

- 00:00-01:20: Several trips to STU.

- 01:28-02:26:  Paul  continuously  moving  between  bed,  STU,  and  floor,  also slumping to the floor in a seated position several times.

- 02:29: Jailers enter the cell, remove Paul, and put him into a restraint chair, further moving the restraint chair to the far corner of the field of view of the camera.

- 04:28: Paul returned to the cell by jailers.

- 04:30-06:30: Paul is continuously moving between the bed, STU, and floor.

- 06:30-10:00: Paul is occasionally going to the STU.

- 13:11-13:24: A medical team is in Paul's cell, and Paul can be briefly seen on the cell floor.

- 13:25-17:43: No motion is purportedly visible in Paul's cell.

- 17:43-17:49: A medical team is in Paul's cell again, and Paul is briefly visible on the cell floor.

- 17:49-21:19: No motion is purportedly visible in Paul's cell.

- 21:19: Someone opens Paul's cell door, and Paul can be seen motionless on the cell floor. Paul is removed at some point, and someone attempts to resuscitate Paul.

76.    The Medical Examiner's Office also reviewed correctional records for December 8, 2020 and apparently found the following important in formulating an opinion regarding Paul's manner and cause of death:

- 10:20: Paul was examined and described as non-verbal and laying naked on his cell floor, and also assessed as being grossly psychotic. Paul was administered Zyprexa intramuscularly, and there was a plan to administer Benadryl.

- 12:02: Paul was examined at the cell, was naked, and did not engage.

- 21:19: A team responded to Paul's cell when a "man down" page was initiated.

- 21:40: Cardiopulmonary Resuscitation was initiated due to a lack of respiration.

77.     The Medical Examiner's Office determined that Paul died of acute water intoxication. Specifically, the conclusions in the autopsy report read, "It is my opinion that Paul Aaron French, a 31-year-old white man, died as a result of acute water intoxication. Because it is unknown whether the water intoxication was a result of intentional self-harm or due to psychosis, the manner of death is undetermined." The Medical Examiner, Chief Deputy Medical Examiner, and Director and Chief Medical Examiner all signed the autopsy report.

78.     The autopsy report, based on a review of Dallas County Jail Correctional Health Services medical records, reads that Paul had a history of major depressive disorder and schizoaffective disorder. Moreover, per those records, Paul had been displaying symptoms of psychosis and suicidal ideation in the days before his death.

79.     It would have been no surprise to Dallas County that Paul died of water intoxication. Video recordings of his cell indicate that he was going back and forth, an unreasonable number of times, to the location in his cell at which he could obtain water. Likewise, as described elsewhere in this pleading, it was commonly-known that people with psychiatric disorders can suffer from a further disorder in which they seek water in an unhealthy volume.

b.     Custodial Death Report (Filed with Attorney General)

80.     The Dallas County Sheriff's Department filed a custodial death report with the Attorney General of Texas regarding Paul's death.  The report indicated that Paul's initial custody was on March 7, 2020 at 5:57 PM, and that Paul died on December 8, 2020 at 10:54 PM. In response to a question about manner of death, the report read, "Could not be determined." Oddly, even though the Dallas County Sheriff's Department already had a copy of the autopsy report, in response to the medical cause of death, the department listed, "Undetermined." The report also provided a false answer to the question, "Exhibit any mental health problems?" The report provided the answer, "No." The report also falsely indicated that Paul had not made any suicidal statements and had not exhibited any medical problems.  It appeared that Dallas County was attempting to cover its liability tracks.

81.     The summary portion of the report read in part that Jailer Ross, at approximately 9:16 PM on December 8, 2020, heard Paul breathing abnormally in "B" cell. He then saw Paul on the floor of the cell with white foam coming out of his mouth. When Jailer Ross knocked on the cell door, Paul was unresponsive. Jailer Funches entered with Jailer Ross, and they removed Paul from the cell. Jailer Ross requested Parkland Jail medical staff to respond to the cell, making such a request at approximately 9:19 PM. Medical staff began administering aid at 9:22 PM, with CPR ultimately beginning at about 9:44 PM (after Paul stopped breathing).  Acadian Ambulance Service responded at approximately 9:54 PM, and left the area with Paul on a gurney, while still administering CPR, at approximately 10:08 PM.

c.     Inmate Death Report (Filed with Texas Commission on Jail Standards)

82.     The Dallas County Sheriff's Department also filed an Inmate Death Reporting Form with the Texas Commission on Jail Standards ("TCJS").  The report indicated that Paul

passed away at 10:54 PM on December 8th, 2020, and that he had been on suicide watch. It also indicated that the last documented check of Paul was at 9:15 PM on the same date, such being made by Defendant Ross. Detective Barney was listed as the investigating officer.

<u>C.     Texas Commission on Jail Standards Investigation</u>

83.     The TCJS specifies minimum standards. Those standards do not even come close to addressing all details of what happens in Texas county jails, and they were not designed or implemented to do so. They also do not detail or direct that specific medical and/or mental health care be given to inmates in certain circumstances. Thus, counties and jailers can violate the Constitution, even if they do not violate specific minimum standards. However, violation of a standard can be some evidence of a constitutional violation.

84.     The TCJS, as it does with all custodial deaths arising in Texas county jails, conducted an investigation of Paul's death. The TCJS did so only to compare what occurred against any applicable minimum standards. The TCJS Death-in-Custody Review Checklist contained recommendations as to whether to issue a notice of non-compliance to Dallas County for failing to meet TCJS minimum jail standards. The TCJS inspector recommended that the TCJS issue such a notice of non-compliance. The Assistant Director, who wrote a report related to Paul's death, also recommended that the TCJS issue to Dallas County a notice of non-compliance. However, the Executive Director trumped the inspector's and the Assistant Director's recommendations. Regardless, while failure to comply with standards can be some evidence of a constitutional violation, compliance with some minimum standards does not equate to compliance with the United States Constitution.

85.     The report regarding Paul's death noted that, while a jailer was assigned to and seated in a housing area with inmates in the portion of the jail in which Paul was incarcerated,

"rounds were not conducted as indicated on the observation sheet and there is no direct view into each of the individual cells. This is an area of non-compliance." Moreover, the report noted that, since Paul's death, the Dallas County jail had received two comprehensive TCJS inspections. Observation of inmates on suicide watch in intake was an area of non-compliance during the February 2022 comprehensive inspection. Further, during review of the custodial death of inmate David Fogg, conducted in July 2022, the TCJS determined that Dallas County jail staff were still not conducting observation rounds correctly. Even though this death occurred after Paul's death, the fact that the County jail was still not conducting observation rounds correctly is some evidence of pre-existing policy, practice, and/or custom which was a moving force behind and caused Paul's suffering and death.

### D.    Defendants' Knowledge and Education

#### 1.    Jail Suicides are a Known, Widespread Problem.

86.    Defendants knew that prisoners frequently commit suicide in county jails. Thus, knowing Paul's serious psychiatric issues and suicidal tendencies, described elsewhere in this complaint, DTO Ross should not have allowed Paul to remain in his cell, unobserved, to apparently ingest vast amounts of water. Likewise, the County knew that is policies, practices, and customs had to be such that they would protect inmates in Paul's condition.

#### 2.    Fifth Circuit's Long-Held Constitutional Standard:    Continuous Observation and Monitoring

87.    Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit 30 years ago, unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was required. In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her

child. Judge Goldberg warned and put on notice all policymakers within Fifth Circuit jurisdiction regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care. **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**
>
> **What we learn from the experiences of Henderson County [Texas] is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice**; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. **We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation**.
>
> So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

Defendants were put on notice long ago that anything short of continuous monitoring of suicidal inmates was insufficient and violated the United States Constitution. The law was clearly established with exacting specificity, and Defendants were charged with knowledge of it.

E.    Liability of the County

1.    Introduction

88.    Plaintiffs set forth in this section of the pleading additional facts and allegations supporting liability claims against the County pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978).  It is Plaintiffs' intent that all facts asserted in this pleading relating to policies, practices, and/or customs of the County support such *Monell* liability claims, and not just facts and allegations set forth in this section.  Such policies, practices, and/or customs alleged in this pleading, individually and/or working together, were moving forces behind and caused the constitutional violations, and damages and death, referenced herein.  These policies, practices, and/or customs are pled individually and alternatively.  The County knew, when the County incarcerated the decedent, its personnel, policies, practices, and/or customs were such that it could not meet its constitutional obligations to provide appropriate mental health treatment to, and protect, the decedent.  The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of the County as it related to its jail.  The Fifth Circuit Court of Appeals has made it clear, through controlling authority, that Plaintiff need not allege at the pleading stage the identity of chief policymaker(s).

89.    There were several policies, practices, and/or customs of the County which were moving forces behind, caused, were producing causes of, and/or proximately caused the decedent's suffering and death, and other damages referenced in this pleading.  The County made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when the County implemented and/or consciously allowed such policies, practices, and/or customs to exist,

it knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

### 2.    County Policies, Practices, and Customs

90.    Plaintiffs list beneath this heading some County policies, practices, and/or customs which Plaintiffs allege, at times upon information and belief, either individually and/or working together, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the decedent's death.  Thus, the County is liable for all such damages.

91.    First, the Dallas County jail had in place certain written procedures. However, as indicated elsewhere in this pleading, such written procedures, as it related to inmate observations, were not the norm. Instead, upon information and belief, customs and practices in the jail were such that inmates were not properly observed. Regardless, Dallas County jail written policies assist in understanding the situation leading to Paul's preventable death.

92.    Chapter 7 of Detentions Bureau Standard Operating Procedures is entitled "Supervision of Inmates." Beneath a "general security" section, a policy indicates that each detainee in the Dallas County jail must be observed face-to-face, once each hour, by the jailer(s) responsible for making such observations. Moreover, in areas of the jail where detainees are known to be assaultive or mentally ill, or who have demonstrated bizarre behavior, observations had to be performed no less than once every 30 minutes.

93.    Chapter 6, entitled "Health Services", contains general procedures for medical staff. That written policy for Dallas County indicates that medical services and personnel for detainees incarcerated in the Dallas County Jail must be provided by Parkland Hospital ("Parkland").

94.     The policy also indicates that Parkland and its personnel, "Are not part of the Sheriff's Department, and thus, do not work for anyone in the Department." Moreover, "No one in the Sheriff's Department may instruct a [Parkland] employee in the performance of their duties. The exception to this is that the Department through its supervisors may direct medical staff to respond to medical emergencies."   Despite this "policy," the County owed non-delegable constitutional duties to Paul.  These duties included providing reasonable medical care and mental health care, protecting Paul from himself and others, and not punishing Paul as a pre-trial detainee.

95.     The "health services" section also contains written policies regarding detainees who refuse medication administration. It indicates that inmates who report illness or injury are "given the opportunity" for medical treatment. Moreover, if an "inmate refuses medical treatment, the inmate is asked to sign a medical refusal form." Further, "if the inmate refuses to sign, the word 'refused' is written on the inmate's signature and witnessed by two staff members." That section of the Health Services Policies for the jail makes no provision at all for detainees such as Paul. It thus makes no provision for people who are incompetent and unable to, with informed consent, deny administration of medication.

96.     Parkland Staff set medication schedules, pursuant to written jail policy. Inmates are to report to a "feeder port in coveralls" and line up with water in a cup. Inmates proceed to the port one at a time, and the jail floor officer stands next to a nurse who in turn administers medication. Medication is placed in the cup of water and taken by the inmate in the presence of the nurse and floor officer. The floor officer is to be positioned so as to see each inmate and to be certain that the inmate takes the medication (excluding medications that can be taken to a detainee's cell, per the nurse, such as ointments). The floor officer must ensure that the detainee swallows the medication before releasing the detainee from the feeder port area. As with the medical refusal

policy, this written policy provides no instruction regarding incompetent detainees. In fact, throughout numerous records related to Paul's final incarceration, situations are referenced in which Paul was apparently called three times for medications and simply did not appear. There was no effort made, apparently, to assure that Paul was taking his medications.

97.     This portion of the jail's written policies and procedures includes a section titled "Suicide Detection and Prevention" regarding housing inmates with "the signs and symptoms of inmate suicidal behavior". This section indicates that detainees displaying suicidal tendencies are to be housed "where staff observes them at more frequent intervals." It thus does not provide for needed continuous monitoring.

98.     The Suicide Detection and Prevention section also contains a subsection entitled "Signs and Symptoms of Suicidal Behavior." That subsection lists as behavioral signs things including a detainee talking about committing suicide; projecting hopelessness or helplessness; displaying signs of strong emotions, including rage or a wish for revenge; and hearing voices that are not there.

99.     Written policies also include a subsection entitled "Suicidal Inmate Monitoring." This section requires that, while a detainee is in such a housing facility, "the inmate is within constant visual observation of an officer."  Upon information and belief, this does not mean that the jailer can actually see enough of the inmate to determine whether the inmate is well and does not need any assistance.  This seems to be clear, because the written policy also indicates that a floor officer/jailer observe the inmate "at frequent intervals, not to exceed 15 minutes." Regardless, upon information and belief, these written policies were not generally and systematically applied in the county jail, or in fact implemented. Rather, upon information and belief, observations were left generally to the discretion of jailers.

100.    Second, the "punishment does not fit the crime" adage applied to how the County reacted to DTO Ross's inaction leading to Paul's death.  This is further evidence of pre-existing practice and custom of not conducting cell checks.  Texas Commission on Law Enforcement ("TCOLE") records for DTO Ross indicate that he started employment as a jailer with the Dallas County Sheriff's Department on July 5, 2011, and that he still was employed in that capacity as of July 2022. Thus, upon information and belief, a reasonable inference is that the manner in which he acted during times relevant to Paul's death was consistent with custom and practice in the jail. This is bolstered by the fact that DTO Ross was a supervisor and training officer.  Thus, DTO Ross set the example as to policy, practice, and custom for others working with him.

101.    Third, failure of the County to terminate DTO Ross's employment after another apparent incident of DTO Ross being involved in falsification of observation records indicates that such falsification was "winked at," even in the event a person received some type of reprimand. A Dallas County Sheriff's Department Office of Internal Affairs document dated January 29, 2020 describes another allegation of DTO Ross documenting prisoner observations which were never made. Detective Thaddrick Love (#828) wrote in part that Internal Affairs was notified by Detention Service Manager Carol Burross (#6511, West Tower Jail) of the following: "On 20th November, 2019 a review was conducted of rounds made on 19th November 2019; 2nd watch, 3rd floor of West Tower Jail. After reviewing camera footage of the entire shift, it was discovered that no more than four of the documented rounds were made during the entire shift. The rounds log book however, recorded nineteen rounds." Thus, she requested an Internal Affairs investigation regarding defendant Ross, under the same provisions under which DTO Ross was reprimanded after Paul's death.

102.    The failure of Dallas County to terminate DTO Ross after the December 2019 incident, compounded by its failure to terminate him after the incident involving Paul's death, was further confirmation of the existing custom and practice in the jail of failing to conduct face-to-face prisoner observations and yet documenting as if those observations had occurred. Upon information and belief, even during December 2019, DTO Ross was a supervisor and training officer.

*Signature  Time  Date*



# MEMORANDUM
## Dallas County Sheriff's Department
## West Tower

Date:        20th November, 2019

To:          Captain Chris Smith, Department of Internal Affairs

From:        Lt. Carol Burross #6511, 2nd Watch Commander, West Tower Jail

Subject:     Request for Investigation

Thru:        Channels

DTO Stefan Ross #8037 began his employment with the Dallas County Sheriff's Department on 5th July, 2011.  He is currently assigned to the West Tower Jail on 2nd Watch Power Shift.

On 20th November, 2019 a review was conducted of rounds made on 19th November, 2019; on 2nd Watch on the 3rd floor of the West Tower Jail.  After reviewing camera footage of the entire shift, it was discovered that no more than four of the documented rounds were made during the entire shift.  The rounds log book however, recorded **nineteen** rounds.  The floor officers assigned to the 3rd floor was as follows:

DTO Stefan Ross #8037
DSO Gregory Morgan #8956
DSO Terry Green #8429
DSO Maria Deltoro #6512
DSO Joshua Gonzalez #9123 (1st Watch Overtime Officer)
DSO Glen Wickersham #8536 (1st Watch Overtime Officer)
DSO Stephen Osifoh #8465 (1st Watch Overtime Officer)
DSO Rondal Wilson #8123 (1st Watch Overtime Officer)

I request an internal affairs investigation on DTO Stefan Ross for alleged violation of the Dallas County Sheriff's Department 2019 Code of Conduct and Civil Service Rule:

**Code of Conduct**
**Chapter 4.0**
Responsibilities and Professional Conduct

**4.03**: Dereliction/Neglect of Duty

103.     Fourth, upon information and belief, Dallas County had a policy, practice, and/or custom of failing to provide information to current personnel working in its jail, including jailers and medical personnel, regarding prior incarcerations of an inmate.  Thus, upon information and belief, if such is true, then information regarding Paul's 2018 incarceration, as well as any other prior incarceration, would not have been provided to jailers, medical personnel, and mental health personnel dealing with Paul during his final incarceration.  However, this is pled in the alternative to an allegation that all such information was available to such persons dealing with Paul and his final incarceration, including Defendant Ross.  If this alternatively–pled allegation is true, it is further evidence of the policy, practice, and/or custom, referenced elsewhere in this pleading, regarding Dallas County not promptly obtaining an order for forced medications for severely mentally ill people such as Paul, and/or not promptly transferring them to an off-site inpatient mental health facility.

104.     Fifth, upon information and belief, the County had a policy, practice, and/or custom of waiting far to long, as indicated by observations of an inmate by non-medical personnel, to file applications for inmates to receive compelled medications.  This resulted in significant suffering.

105.     Sixth, further, upon information and belief, Dallas County chose not to sufficiently staff its jail.  This was evidenced in part by DTO Ross being required to work 16 hours on the day that Paul was ultimately found unresponsive, and which concluded in Paul's death.  Thus, DTO Ross was likely quite tired, and not nearly as sharp as he would have been had he had time off work and sufficient sleep.  Further, if the jail had been fully staffed, there would have likely been another person besides DTO Ross making cell checks of Paul.

106.     Seventh, upon information and belief, it was a common custom and practice, well-known in the jail, to falsify prisoner observation records.  Some evidence of this was Defendant

Ross's statement that falsifying observation records was a common practice for jailers who worked "crisis tanks" in the County jail. Likewise, observation records which had exact, 15-minute interval times in them are contrary to human nature. Humans do not generally do tasks at the exact minute required, when the task is required to be completed periodically, over the course of an 8-16 hour shift.

107.    Eighth, Dallas County did not have a policy, practice, and/or custom of monitoring water usage of inmates in it jail who had psychiatric disorders, particularly those with schizophrenia. It is well known that people with psychiatric disorders, particularly those with schizophrenia, as was the case with Paul, commonly manifest psychogenic polydipsia. This refers to people seeking water and excessively drinking, which can be accompanied by hyponatremia and water intoxication. It has long been known that compulsive drinking of water is associated with a broad spectrum of psychopathology from mild neurosis to psychosis. Likewise, Dallas County knew that excessive water consumption can be dangerous, up to and including death. Unfortunately, the failure to have such a policy, practice, and/or custom resulted in Paul's death.

108.    Ninth, the County had a policy, practice, and/or custom of not continuously monitoring inmates with suicidal tendencies. Thus, intervention into Paul's apparent ingestion of vast amounts of water did not occur.

109.    Tenth, upon information and belief, the County was fully aware that the custom and practice in the jail was not to conduct inmate observations as required by TCJS standards and/or well-known jail industry standards. According to one article, the County was so aware of such occurrences that it alleged that it would install a video system to assure that checks were being made. However, the County's failure to do so over a lengthy period of time evinced the custom

and practice of deliberate indifference as to the confirmation that such observations were occurring.

110.    Eleventh, upon information and belief, Dallas County did not have a policy or in-house procedures in place to restore competency of detainees, like Paul, who had been declared incompetent but who had not been transferred to an appropriate outside facility for competency restoration.  This was feasible.  Some evidence of feasibility was, upon information and belief, implementation or planned implemented of such a competency restoration program by one or more other county jails in Texas (and perhaps jails outside Texas as well).

### 3.    TCJS Records Demonstrating County Practices and/or Customs

111.    TCJS reports and documents regarding inspections of the County jail further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, and/or were producing causes of damages and death asserted in this pleading.  The TCJS documents also show that the County was put on notice of deficient policies, practices, and customs well before the decedent's death.  Any documents regarding inspections after the decedent's death are some evidence of pre-existing policies, practices, and/or customs.

112.    The TCJS inspected Dallas County jails from March 4-8, 2013.  When reviewing face-to-face observation logs for the North Tower, inspectors found that inmates, after being moved to upper floor holdover cells, were not being observed at least once every 30 minutes as required by TCJS minimum jail standards. TCJS staff were to follow up with jail administration in 30 to 90 days to ensure full compliance with minimum jail standards. TCJS inspectors also found, when walking through the South Tower, that face-to-face observation of inmates in the area in which inmates were known to be assaultive or displayed bizarre behavior were likewise not

being checked every 30 minutes, at a minimum, as required by TCJS minimum standards.  This was the same type of area in which Paul was incarcerated shortly before his death.  TCJS staff would likewise need to follow up with Dallas County Jail Administration in 30 to 90 days to ensure full compliance with TCJS standards.

113.    On October 18, 2018, upon information and belief as a result of an inmate death in the Dallas County jail, the TCJS found the Dallas County jail to be in non-compliance with TCJS minimum standards. The TCJS urged Dallas County to give areas of non-compliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. Moreover, "failure to initiate and complete corrective measures following receipt" of the notice "may result in the issuance of a remedial order." The TCJS inspector wrote, "After reviewing video evidence as provided by the facility administration, it was determined that the 30-minute face-to-face observations, on the inmate in question, did not occur as notated on the observation log." Dallas County thus continued having issues with observing inmates. Upon information and belief, these issues, and customs and practices, would come to light only in the event of, typically, the death of an inmate. When inmates were not dying, upon information and belief, these customs and practices remained known to only those working in the Dallas County jail.

114.    The TCJS inspected the Dallas County Jail from January 14, through 18, 2019.  The TCJS inspector determined, when reviewing suicide prevention training records, that most of the Dallas County Jail staff had completed training, but there was no reoccurring training as required by the operational plan or as generally required. Further, when reviewing health services documentation, the inspection team found that a magistrate was not being notified on occasion as required by the intake screening form. Magistrate notification is important for those inmates who

are determined, at booking, to be suicidal or who have serious medical and/or mental health issues. This is a method whereby someone outside the jail, who has power to do something, can be notified of an issue within the jail.

115.    The Dallas County Jail was inspected once again by the TCJS from November 18 through 22, 2019.  Inspectors determined, when reviewing health services documentation in the jail, that not all continuity of care query matches were being recorded on the intake screening form. A continuity of care query seeks to determine whether a detainee has received inpatient mental health services previously. This is very important information, to assist in determining those inmates with severe mental health issues and resulting appropriate actions which those working in the jail must take. Moreover, as was a continuing issue in the jail, and which resulted in Paul's death, while reviewing inmate observation logs, TCJS inspectors determined that Dallas County jail staff continued to exceed the required minimum 30-minute observation. In holding and detox cells they would exceed this by as little as one minute, and by as many as 11 minutes. Further, inspectors determined that jail staff would on occasion exceed the 30-minute minimum observation period in the North Tower, second floor separation housing units, by as little as one minute and by as many as 9 minutes. Inmates in that area are those who were on disciplinary segregation and who are known to be assaultive.

116.    The TCJS inspected the Dallas County Jail once again from February 8th through 12th, 2021. As a result, the TCJS listed the Dallas County Jail as being non-compliant. Once again, Dallas County was urged to give areas of non-compliance its serious and immediate consideration, and to promptly initiate and complete appropriate corrective measures. Failure to do so could result in issuance by TCJS of a remedial order. As was the case with all other inspection reports mentioned in this pleading, upon information and belief, the reports were signed by the Dallas

County Sheriff, jail administrator, and a Commissioner's Court representative. There were a number of issues noted in the report. While reviewing annual classification audit documentation, inspectors found that required classification reassessments exceeded the required 30-to-90 day reassessment time frame by as little as three days, and by as many as 23 days, on multiple occasions. Classification is very important to protect inmates, both from themselves and others. Reassessments following disciplinary action were conducted anywhere from 10 to 83 days after the disciplinary action was taken. This likewise violated the standard requiring reassessments to be conducted immediately upon any disciplinary action.

117.     Further, during a walkthrough of single cells in the West Tower, which is where Paul was housed, the inspection team found that inmates on suicide watch were not allowed access to the dayroom even for the one-hour minimum per day in accordance with minimum standards. Inmates on suicide watch had not been offered or received access to the dayroom from anywhere from two to as many as 15 days. Further, since they were not allowed such access, they had not even showered while on suicide watch. This showed a total disregard for the severe mental health issues of those inmates who were suicidal.

118.     Inspectors also found that there was a custom and practice of modifying observation records after made. While reviewing face-to-face observation documentation, the inspection team found that jail supervisors would strike through, with a pen, an original recorded time by a floor jailer if the time was for a "late" face-to-face observation, or if the time was wrong or duplicated. The supervisor would then write the purported correct time and initial next to it.

119.     Further, when walking through the entire Dallas County jail, the inspection team found that indigent inmates were not receiving any personal care items, including toothpaste, toothbrushes, shampoo, conditioner, and body washes. Inspectors also found that, with regard to

multiple grievances, inmates did not receive the required 15-day interim response by the grievance board. Thus, there were wholesale issues throughout the jail, showing deliberate indifference to the basic human needs of inmates. This even included the failure to provide indigent inmates paper, pencils, envelopes, and stamps to correspond with their attorneys and the courts, family, and friends. This violated a TCJS minimum standard.

120.    The TCJS inspected the Dallas County Jail again from February 14 through 18, 2022. The Dallas County Jail, once again, failed the inspection. It was thus once again listed at the TCJS website as being non-compliant. Once again, the Dallas County Sheriff, jail administrator, and Commissioner's Court representative signed the annual jail report. There were several issues of non-compliance. One such issue was the occurrence, with multiple inmates, of possibly being misclassified using a point additive classification system. Mis-classified inmates can result in inmates being improperly mixed, which can further result in assault and/or death from assault. Further, when inspectors reviewed document observation logs in the intake holdover housing unit, they found that observations of suicidal inmates in the area were being incorrectly documented. When reviewing other observation logs and comparing them to video evidence, the inspection team and jail staff found instances where observation logs were incorrectly documented. As a result, jail administration had to provide the lead TCJS inspector weekly verification and observation logs, and video documentation of same had to be compared and verified. The failure to conduct appropriate observations was a continued problem in the Dallas County jail, both before and after Paul's death. This is some evidence of custom and practice.

121.    Inspectors also found that inmates were not receiving clean uniforms even once each week. Further, approximately 40 housing unit doors were completely inoperable. In the West

Tower, inmates on crisis and suicide watch were apparently not receiving appropriate recreation, at appropriate intervals.

122.     The TCJS conducted another inspection of the Dallas County Jail from May 31 through June 2, 2022, and once again found several issues. Inspectors found that one inmate, who was transferred to the Texas Department of Criminal Justice, required specialized medical care. Regardless, the Dallas County Jail failed to make any contact with the TDCJ Office of Health Services liaison before that inmate's transfer. This happened apparently with regard to at least two inmates.

123.     Regarding inmate observations, when reviewing 60-minute check logs, the inspection team found that jail supervisors were writing on the logs "appears altered" regarding time entries made by jailers. The TCJS inspection team recommended that such accusations be recorded in documents other than the actual inspection logs. Regardless, this is further evidence of the continued issue of altered logs in the Dallas County jail.

124.     The Dallas County jail's issues continued, as evidenced by a September 6, 2022 inspection by TCJS. The special inspection report arose out of yet another death in the Dallas County Jail. The inspector wrote, "A review of video submitted after a custodial death revealed that observation rounds were not conducted in accordance with minimum jail standards." Dallas County had to submit a corrective plan of action to the inspector within 30 days. Such a corrective plan of action had to include "some type of training for jail staff."

4.     Newspaper Articles Regarding County Practices and/or Customs

125.     A number of newspaper articles provide additional information regarding unconstitutional customs and practices at the Dallas County jail. One article, dated February 16, 2022, in the Dallas Observer, was entitled, "Amid Deaths and Inspections, Records Show Crisis-

Level Staffing Shortages in Dallas County Jail." The article provides information regarding the death of Deron Tolbert. Mr. Tolbert was 31 years old at the time he was incarcerated in the Dallas County Jail, on a charge of indecent exposure. Mr. Tolbert had struggled with a severe mental illness, the same as Paul, schizoaffective disorder. Jailers determined, as they did with Paul, that Mr. Tolbert had a mental illness during their preliminary screening at the time he was booked–in to the jail. The article notes that two officers signed off on a recommendation that Mr. Tolbert be housed in the West Tower. As indicated elsewhere in this pleading, that is the location at which Paul was incarcerated. The article notes that the West Tower is generally reserved for people with mental health issues. Regardless, Mr. Tolbert died after jailers failed to respond to signs of distress from Mr. Tolbert until after other inmates alerted them.

126.     The article further references "multiple jailers" communicating that events regarding Mr. Tolbert's death were a result of crisis-level staffing shortages in the Dallas County jail. Such shortages persisted through the pandemic, including during, upon information and belief, Paul's final incarceration in the Dallas County jail. Jailers told the reporter that there were not the state-mandated number of jailers working each shift, and jailers thus did not have enough people to fulfill their duties in the mental health units of the jail (including the West Tower). Thus, upon information and belief, the County was not complying with TCJS minimum standards regarding staffing.

127.     The article further described an ongoing issue in the jail which is referenced in several other places in this pleading. The article indicates that the Dallas County Sheriff's Department allegedly "long had plans to install a video software system designed to document if jailers were complying with the State's required monitoring schedules." However, as of the date of the article, such a system still was not in place.

128.     Another article, dated March 22, 2022, and also published in the Dallas Observer was entitled "Texas Jail Agency Opaque About Single 'Criminal Investigation' Into Dallas County Jail Death." The article references the death of Terry Stewart in the Dallas County Jail, who was being held in a solitary confinement cell in the suicide watch wing of the jail. The article indicates that jailers are required to monitor detainees 24 hours a day, making observations once each 15 minutes. As with Mr. Tolbert's death, jailers were allegedly not aware of emergency situations involving Mr. Stewart until being alerted by other inmates. A Dallas County Commissioner, Elba Garcia, flatly admitted regarding the jail, "We don't have enough people."

129.     Another article, dated May 17, 2022, addressed numerous broken doors in the Dallas County jail. The jail had become so lax that inmates were allowed to jam jail doors, such that they could not be locked. Sheriff Marion Brown admitted that door tampering was due to poor inmate behavior and "a relaxed culture at the jail that she said developed over a long period of time." She called it a case of "broken windows," which referenced a policing theory that holds that small violations which are not addressed will encourage more serious violations. This laxness also led to and was a cause of Paul's death.  Sheriff Brown also admitted, that as of her interview, 722 inmates were awaiting transfer to a state criminal justice facility, and 406 inmates were waiting for transfer psychiatric beds.

130.     Another article, published March 8, 2022, in the Dallas Observer, was entitled "Repeat Offender: Dallas County Jail Fails Inspection for Second Straight Year." The article addresses what is referenced elsewhere in this pleading. This is further evidence, and gives rise to inferences, regarding policies, practices, and customs leading to and being moving forces behind Paul's death. The article notes that the "jail's failing grade," indicated in an inspector's report, was provided to the Dallas County judge and sheriff.

131.    Finally, an article dated November 3, 2022, and published in the Dallas Morning News, was entitled "Dallas Commissioners Consider Suing Texas Over Inmate Wait Times for State Hospital Beds." The article admits that hundreds of inmates are languishing for months, or even years, in the Dallas County jail after having been determined to be incompetent to stand trial. Incompetency to stand trial means that a person cannot even understand the proceedings against him or her. The article notes that courts have determined that, to preserve the right of due process, efforts to restore competency to such people must be made before a trial can proceed. This cannot occur unless and until competency restoration efforts are made by appropriate personnel. Dallas County Commissioners have now considered suing the state of Texas, so that Dallas County can transfer inmates, such as Paul, to an outside facility. Regardless, Dallas County has and had at the time of Paul's death a non-delegable duty to comply with the United States Constitution. While Dallas County may choose to ultimately sue Texas as a result of it not accepting incompetent inmates such as Paul, Dallas County had an obligation to restore Paul's competency, waiting time or not aside.  The article further disclosed that Dallas County's average wait time for a state psychiatric hospital bed was longer than that of any other urban county in Texas, some waiting over 800 days for hospital admittance. This cannot comply with the United States Constitution.

5.    Prior Deaths at the County Jail

132.    The County was put on notice long ago that it must have in place appropriate policies, practices, and/or customs to avoid inmate deaths. It was put on notice of several issues, including the importance of appropriate medical care and continuous observation when necessary.

133.    On November 12, 2010, at approximately 6:20 A.M., Ronald Chamber was found unresponsive on the floor of his cell at the Dallas County jail. An autopsy revealed that Mr. Chamber died of a heart attack.

134.     Andrew Lee Farris, Jr. was taken into custody at the Dallas County jail on August 29, 2010. Andrew had a known history of hypertensive cardiovascular disease and sickle cell anemia, for which he taking prescribed medication. On October 11, 2010, at 4:01 A.M., inmates called the control center officer to inform him that Andrew had passed out. Andrew was given medication but was found unresponsive less than an hour later. An ambulance transported Andrew to the hospital, where he was pronounced dead at 5:28 A.M. An autopsy revealed that he suffered from end stage renal disease and died from complications of hypertension and sickle cell anemia.

135.     On November 6, 2010, Melville John Lougheed was arrested and was transferred to the Dallas County jail on November 8, 2010. Following intake and booking on November 15, 2010, Melville was transferred to the hospital for unspecified treatment related to his hypertensive cardiovascular disease. Melville was treated and transported back to Dallas County jail that afternoon. By that evening, Melville was found face-down and unresponsive in his cell and later pronounced dead. The custodial death report lists Melville's cause of death as cardiac arrest.

136.     Shirley Kathleen Simpson was taken into custody and booked into the Dallas County jail on March 12, 2011, and taken to a medical ward. On March 14, 2011, Shirley was found unresponsive and transported to the hospital where she was pronounced dead the following day. An autopsy revealed that Shirley's cause of death was congestive heart failure and cardiac disease.

137.     In the early morning hours of October 6, 2011, Jason Thomas Evans was found unresponsive in his cell at the Dallas County jail. Jason was face-down and had clothing tied around his neck. Jason was transported to a hospital where he was pronounced dead at 3:40 A.M. The custodial death report does not include details as to whether Jason was on suicide watch at the time of his death.

138.    On August 29, 2011, an inmate alerted detention officers that Sandra Kay Bursley needed medical attention. Sandra was transported to the hospital where she was pronounced dead. Sandra had previously notified staff at the Dallas County jail that she was not feeling well and had a history of high blood pressure and seizures. An autopsy later revealed Sandra's cause of death to be hypertension.

139.    On October 6, 2011, at the Dallas County jail, a detention officer noticed Billy Joe Reeves lying in his bunk and breathing shallowly. Billy was transported to a hospital, where was pronounced dead that evening. The custodial death report lists Billy's cause of death as hypertensive and atherosclerotic cardiovascular disease but provides no further details.

140.    Hanson Thacker was booked into the Dallas County jail on September 16, 2011, and placed in a "time out room" where he was supposed to be monitored hourly. Shortly after being placed in the "time out room," Hanson was found unresponsive. Hanson was transported to the hospital where he was pronounced dead. The custodial death report lists Hanson's cause of death as atherosclerotic and hypertensive cardiovascular disease but provides no further details.

141.    On April 19, 2012, Dominic S. Kelly suffered a seizure in his cell at the Dallas County jail. Dominic was transported to the hospital where he was pronounced dead. The custodial death report lists Dominic's cause of death as hypertensive cardiovascular disease but provides no further details.

142.    On February 15, 2012, Curtis Lee Reynolds suffered a medical emergency in his cell at the Dallas County jail. Curtis was transported to the hospital where he was pronounced dead. The custodial death report lists Curtis's cause of death as bilateral pulmonary thromboembolic and deep venous thrombosis but provides no further details.

143.    Jonathan Hayden Beck was booked into the Dallas County jail on July 10, 2012. On September 18, 2012, Jonathan was found deceased in his cell with a plastic bag around his head. Jonathan had a history of mental illness and was taking prescribed anti-psychotics at the time of his suicide.

144.    Johnny Johnson was booked into the Dallas County jail on July 12, 2012. On September 21, 2012, Johnny began having trouble breathing and was transported to the hospital, where he later died. The custodial death report lists Johnny's cause of death as multi-organ failure caused by autoimmune hemolytic anemia but provides no further details.

145.    On October 14, 2012, James Lee Woodward was found unresponsive in his cell at the Dallas County jail. James was transported to the hospital where he was pronounced dead. The custodial death report lists James's cause of death as a seizure disorder due to accidental remote blunt head trauma but provides no further details.

146.    James Robert Dungan Jr. was found unresponsive in his cell at the Dallas County jail on October 15, 2012. James was transported to the hospital where he was pronounced dead. The custodial death report lists James's cause of death as hypertensive and atherosclerotic cardiovascular disease but provides no further details.

147.    On October 4, 2012, officers called into the housing area of the Dallas County jail for Jeffrey Tyrone Crawford, who was set to be released. When Jefferey did not respond to multiple calls, officers entered the housing area and found him unresponsive in his cell without a pulse. Jeffery was transported to the hospital where he died later that afternoon from dilated cardiomyopathy associated with chronic alcoholism.

148.    On October 26, 2012, Cynthia Laverne Harper was found unresponsive in her cell at the Dallas County jail. Cynthia was transported to the hospital where she was later pronounced

dead. The custodial death report mentions that Cynthia may have died from a pre-existing medical condition and states that her cause of death was determined to be cardiac hypertrophy associated with hypertensive cardiovascular disease and morbid obesity, but it provides no further details.

149.    On December 11, 2012, Elicia Ann Gonzales was found unresponsive in her bunk at the Dallas County jail. After being transported to the hospital, Elicia was pronounced dead due to toxic effects of heroin. The custodial death report notes that Elicia was in a detox cell but provides no further details.

150.    On November 23, 2012, Daniel Cardoza collapsed and began seizing in the Dallas County jail. Daniel then became unresponsive and was transported to the hospital, where he died that evening. The custodial death report lists Daniels cause of death as cardiac hypertrophy of unknown etiology but provides no further details.

151.    On April 9, 2013, Edward Lee Dunson collapsed in the Dallas County jail during an escort. Edward was transported to the hospital where he was pronounced dead. The custodial death report lists Edward's cause of death as atherosclerotic and hypertensive cardiovascular disease but provides no further details.

152.    On September 21, 2013, Derrick Wayne Young was found unresponsive in the Dallas County jail. Derrick was transported to the hospital where he was pronounced dead. The custodial death report lists Derrick's cause of death as acute myocardial infarct and hypertensive and atherosclerotic cardiovascular disease but includes no further details.

153.    On October 29, 2013, Jerry David Saner, an inmate at the Dallas County jail, was transported to the hospital after complaining of shortness of breath. Jerry was pronounced dead the afternoon of the same day from exacerbation of chronic obstructive pulmonary disease and

lung cancer. The custodial death report provides no further details as to the circumstances surrounding Jerry's death.

154.     On September 24, 2013, Willie George Lafayette was found unresponsive on the floor of his cell. Willie was transported to the hospital where he was pronounced dead later that evening. Willie's cause of death was determined to be an acute subdural and subarachnoid hemorrhage due to blunt head trauma. The custodial death report was not amended to include details from the official cause of death report.

155.     Marco Caballero-Gomez, who had been an inmate at the Dallas County jail since October 31, 2012, was transported to the hospital on January 28, 2013, for treatment of several underlying conditions. Later that same day, Marco died from intracerebral hemorrhage complicating hypertensive cardiovascular disease.

156.     On the evening of December 1, 2013, Dallas County jail inmate, Karen Renee Galloway, was transported to the hospital because she was having trouble breathing and was spitting up blood. Karen died a few hours later in the early morning hours of December 2, 2013, from necrotizing bilateral lobal pneumonia.

157.     On the morning April 20, 2014, Alisha Skeats was found unresponsive in her cell at the Dallas County jail after vomiting for hours the night before. The custodial death report details Alisha's ongoing detox symptoms, such as vomiting. Alicia's cause of death was determined to be complications of chronic opiate, benzodiazepine, and ethanol use.

158.     On November 18, 2014, Saturnino Arredondo was transferred from the Dallas County jail to the hospital after complaining of chest pains and passing out. Saturnino was pronounced dead later that evening as a result of hypertensive and atherosclerotic cardiovascular

disease. The custodial death report provides no further details as to the circumstances surrounding Saturnino's death.

159.    Officers responded to a residence on November 24, 2015, and found Eric Ladale Ricks panicking and acting erratically. Officers restrained Eric and transported him to the Dallas County jail. Upon arrival, officers opened the rear door of their police vehicle and found Eric unresponsive and not breathing. Officers carried him into the Dallas County jail. Eric was then transported to the hospital, where he was pronounced dead the next morning on November 25, 2015. Eric's cause of death was determined to be toxic effects of phencyclidine.

160.    On April 10, 2014, Paul Roberts was booked into the Dallas County jail. Paul had known underlying medical conditions and had previously received treatment in the jail infirmary and at a hospital. Paul was transported to the hospital on February 28, 2015, where he was pronounced dead at 8:38 a.m.

161.    Sonya Dannett Tapley was arrested and booked into the Dallas County jail in the afternoon of May 7, 2015. The following day, jail staff found Sonya having a seizure. Sonya was transported to the hospital, where she was pronounced dead that evening. The custodial death report lists Sonya's cause of death as hypertensive and atherosclerotic cardiovascular disease but provides no further details.

162.    Dorothia Estelle Leija was arrested and booked into the Dallas County jail on October 7, 2015, at 5:55 p.m. On October 10, 2015, Dorothia was found unresponsive in her cell. Dorothia was transported to the hospital where she was pronounced dead that same morning. The custodial death report lists Dorothia's cause of death as hypertensive and atherosclerotic cardiovascular disease but provides no further details.

163.    On July 22, 2016, Gary Long was transported from the Dallas County jail to a hospital because he could not get out of his bunk. Gary received medical treatment for a few days but was pronounced dead on August 6, 2016. The custodial death report lists Gary's cause of death as hemorrhagic shock but provides no further details.

164.    On March 24, 2017, jail staff found Thomas Frizzell unresponsive and naked in his cell at the Dallas County jail. Thomas had a white sheet tied around his neck and connected to a bedrail. Thomas was pronounced dead at 7:17 p.m. from strangulation by suicide. The custodial death report does not include details as to Thomas's mental health or whether he was on suicide watch at the time of his death.

165.    Janara Leighton Wright was arrested and booked into the Dallas County jail on August 21, 2016. On November 29, 2017, jail staff responded to a medical emergency, and Janara was transported to the hospital. Janara was pronounced dead on November 30, 2017 from an underlying medical condition that is not specified on the custodial death report.

166.    Crawford Collette Lane, Jr. was arrested and booked into the Dallas County jail on June 16, 2017. Crawford was placed in the medical housing unit. On July 27, 2017, Crawford expressed that he was too weak to take medication, and jail nurses transported him to receive treatment from a nurse practitioner. Crawford then became unresponsive and was transported to a hospital where he was pronounced dead that evening from an apparent heart attack.

167.    On October 10, 2017, Jeremy Javon Rideaux complained of chest pains. Jeremy was then transported to the hospital, where he was pronounced dead. The custodial death report lists Jeremy's cause of death as atherosclerotic coronary artery disease but provides no further details.

168.     Dallas William Eckman was booked into the Dallas County jail on August 25, 2017. On August 26, 2017, jail staff found Dallas shaking uncontrollably and sweating profusely. Dallas was transported to the hospital where he was pronounced dead. The custodial death report lists Dallas's cause of death as a drug overdose.

169.     Rad Douglas Harrison was transferred to the Dallas County jail on December 11, 2017. On December 17, 2017, Rad hung himself in his cell, where he was later discovered by another inmate hanging from a makeshift noose fashioned from towels. Rad was transported to the hospital, where he was pronounced deceased shortly after midnight on December 18, 2017, from strangulation by suicide.

170.     Carlos Ramirez was booked into the Dallas County jail on July 11, 2017. During his time in custody, Carlos was seen by medical staff on several occasions. On January 17, 2018, Carlos complained of stomach pains and was transferred to the hospital. The following morning, Carlos was pronounced dead from septic complications from an infection. The custodial death report provides no further detail as to the circumstances surrounding Carlos's death.

171.     On September 29, 2018, a detention officer at the Dallas County jail found Rickey Ray Alvis unresponsive in his tank. Ricky was transported to the hospital, where he was later pronounced dead. The custodial death report Report lists Ricky's cause of death as atherosclerotic cardiovascular disease but provides no further detail.

172.     On August 3, 2018, Rodney O'Neal was seen by medical staff at the Dallas County jail. During a follow-up visit by jail staff, Rodney became unresponsive. Rodney was transported to the hospital where he died later that evening. The custodial death report lists Rodney's cause of death as hypertensive cardiovascular disease but provides no further details.

173.    On December 4, 2018, Devon Alexander Mosley was found unresponsive in his cell at the Dallas County jail. Devon was transported to the hospital where he was pronounced dead a couple of hours later. The custodial death report lists Devon's cause of death as a combination of underlying medical conditions, including deep venous thromboses.

174.    On September 23, 2017, Steven Lee Mckennis was found unresponsive in his cell at the Dallas County jail. Steven could not be resuscitated and was pronounced deceased later that evening. Steven's cause of death was due to underlying medical conditions combined with the toxic effects of synthetic cannabinoids.

175.    William Norman Allen was transported from the Dallas County jail to the hospital on July 19, 2019, to receive treatment for complications from underlying medical conditions. On August 12, 2019, William became unresponsive and was pronounced deceased that evening.

176.    Steven Ryan Roberts was booked into the Dallas County jail on October 4, 2018. On March 19, 2019, Steven was found unresponsive. Steven was transported to the hospital, where he was pronounced deceased less than hour later. An autopsy revealed Steven's cause of death to be a drug overdose. The custodial death report provides no further detail as to the circumstances surrounding Steven's death.

177.    On September 30, 2019, Robert Charles Nickerson was found unresponsive in his cell at the Dallas County jail. Robert was pronounced deceased that afternoon. The custodial death report lists Robert's cause of death as hypertensive and atherosclerotic cardiovascular disease but provides no further details.

178.    On July 6, 2019, Lee O. Davis was transported to the hospital for medical evaluation and treatment. Lee was pronounced deceased on July 30, 2019. The custodial death

report lists Lee's cause of death as complications from Epstein Barr viremia and hypertensive cardiovascular disease and details several known conditions for which Lee received treatment.

179.    On May 10, 2019, an inmate at the Dallas County jail alerted jail staff that Dennis Wayne Davis was breathing erratically and not responding. Dennis was transported to the hospital where he pronounced dead. The custodial death report lists Dennis's cause of death as hypertensive and atherosclerotic cardiovascular disease but provides no further details.

180.    On June 12, 2020, Ignacio Leyva Ramirez passed out in the dayroom at the Dallas County jail. Ignacio was transported to a hospital where he was pronounced dead a couple of hours later. The custodial death report lists Ignacio's cause of death as atherosclerotic cardiovascular disease and diabetes mellitus.

181.    On March 29, 2020, a detention officer at the Dallas County jail observed Salvador Rodriguez, Jr. attempting to hang himself with a ligature fashioned from jail issued bedding. Jail staff entered the cell after Salvador suspending himself from a wall-mounted bookshelf in the cell. Salvador could not be resuscitated and was pronounced deceased less than hour after he was observed tying off the ligature.

182.    On May 6, 2020, James Bobbitt was found unresponsive his cell at the Dallas County jail. James was transported to the hospital where he was pronounced dead. The custodial death report lists James's cause of death as hypertensive and atherosclerotic cardiovascular disease.

183.    On January 9, 2021, Robert Bryant, Jr. was found unresponsive in his cell at the Dallas County jail. Robert was transferred to a hospital and was pronounced dead less than two hours later. Robert's cause of death was cardiovascular disease along with other known comorbid

underlying physical and mental health conditions. The custodial death report lists several conditions but provides no further details as to the circumstances surrounding Robert's death.

184.    On July 20, 2021, Christopher Darnell Williams was found hanging in his cell at the Dallas County jail. Christopher had fashioned a ligature out of bedsheets. Christopher was transported to a hospital in critical condition, where he died on July 22, 2022.The custodial death report lists Christopher's cause of death as strangulation by suicide but does not provide further details as to the circumstances surrounding his death.

185.    On March 11, 2022, Terry Wayne Stewart was found unresponsive, with incisions on his neck, in a pool of his own blood at the Dallas County jail. The last face-to-face observation occurred almost two hours before jail staff found Terry, who had slit his neck with razor blades. Terry was pronounced dead that same morning. The custodial death report lists Terry's cause of death as incised wounds of neck by suicide.

186.    James Lee Manning was transported from the Dallas County jail to a hospital on May 26, 2021, for medication treatment., James was pronounced dead on June 22, 2022. The custodial death report lists James's cause of death as cardio pulmonary arrest but provides no further details.

187.    On December 13, 2021, medical stuff at the Dallas County jail called and ambulance for Deron Markeith Tolbert after he suffered medical emergency. Deron was transported to a hospital where he was pronounced dead later that morning from pulmonary thromboembolism.

188.    On April 1, 2022, Taylon Breshoud Dickerson was found unresponsive and bleeding in his cell at the Dallas County jail. Taylon was transported to the hospital where he was diagnosed as brain bread. Taylon remained on a ventilator for organ donation and was pronounced

dead April 5, 2022. The custodial death report lists that Taylon's cause of death was fatal hyponatremia, or low sodium, which can result from several conditions. The underlying condition that caused Taylon's death is listed as undetermined.

189.    On December 21, 2021, David Keith Fogg was found unresponsive in his cell at the Dallas County jail. David was transported to a hospital where he was pronounced dead the same day. David suffered from schizophrenia and was diagnosed as autistic. The custodial death report lists David's cause of death as atherosclerotic cardiovascular disease.

190.    On June 9, 2022, A. D. Johnson, III was found unresponsive at the Dallas County jail. A. D. was transported to a hospital where he was pronounced dead. Preliminary autopsy results showed that A. D. suffered from several underlying health conditions. The custodial death report lists A D.'s cause of death as a pulmonary embolism.

191.    Ike Muniez was booked into the Dallas County jail on April 12, 2022. At that time, Ike disclosed underlying heart issues. On April 15, 2022, Ike was found unresponsive in his cell. An ambulance transported Ike to a hospital where he was pronounced dead that same day. The custodial death report lists Ike's cause of death as hypertensive and atherosclerotic cardiovascular disease complicated by diabetes mellitus.

III.    Causes of Action

    A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

192.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him.  *Id.* at 2470.  The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was

*objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

193.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

194.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' or jailers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case. The court should not apply a subjective state of mind and/or deliberate indifference standard. The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

B.    Remedies for Violation of Constitutional Rights

195.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.    Therefore, Plaintiffs individually, and on behalf of Wrongful Death Beneficiaries and Claimant Heirs, seek, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.    If the decedent would had lived, the decedent would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.    Plaintiffs incorporate this remedies section into all sections in this complaint asserting cause(s) of action and requests for relief.

C.    Cause of Action Against Stefan Ross Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

196.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Stefan Ross is liable to Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries, pursuant to 42 U.S.C. § 1983, for violating the decedent's rights constitutional rights, including those to reasonable medical/mental health care, to be protected, and/or not to be punished as a pretrial detainee.    These rights are guaranteed by at least the 8th and/or 14th Amendments to the United States Constitution. Pre-trial detainees are entitled to protection, and also not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

197.    Stephan Ross acted and failed to act under color of state law at all times referenced in this pleading.  He wholly or substantially ignored the decedent's obvious serious mental health issues and self-harm tendencies, and he was deliberately indifferent to and acted in an objectively unreasonable manner regarding those issues and/or needs.  He failed to protect the decedent, and his actions and/or inaction referenced in this pleading resulted in unconstitutional punishment of the decedent.  Stephan Ross was aware of the excessive risk to the decedent's health and safety and was aware of facts from which an inference could be drawn of serious harm, suffering, and death.  Moreover, he in fact drew that inference.  Stephan Ross violated clearly–established constitutional rights, and his conduct was objectively unreasonable in light of clearly–established law at the time of the relevant incidents.

198.    In the alternative, Stephan Ross's deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading.  The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause.  *Id* at 2470-71.  Constitutional rights set forth in this section of the pleading, and constitutional rights affording pretrial detainees protection against excessive force, all flow from the 14th Amendment's Due Process Clause.  *Id*. Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations is identical.

199.   Stephan Ross is not entitled to qualified immunity.[1]  His failure to protect the decedent, and other actions and/or inaction referenced in this pleading, caused, proximately caused, and/or were producing causes of the decedent's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries.

---

[1]   The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws. Courts do not.  However, the qualified immunity defense was invented by judges.  When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution.  Plaintiffs respectfully make a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Stephan Ross cannot show that he is entitled to qualified immunity.  This should be Stephan Ross's burden, if he chooses to assert the alleged defense.  Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983.  *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring).  Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on plaintiffs who suffer violation of their constitutional rights.  Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases).  Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity.  *Schwartz, supra* at 1798–99.  *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting).  Additionally, qualified immunity violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3).  Plaintiffs include allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

200.    Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the administrator, from Individual Defendants:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses;

- the decedent's funeral expenses; and

- exemplary/punitive damages.

201.    Plaintiff(s) and Wrongful Death Beneficiaries also individually seek and are entitled to all remedies and damages legally available to each such person individually for 42 U.S.C. § 1983 claims.  They seek such damages as a result of the wrongful death of their respective son and father, as legally applicable and available.  Those damages were caused and/or proximately caused by Stephan Ross.  Therefore, his actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by these people, for which they individually seek compensation, each as legally appropriate:

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered as a result of the decedent's death;

- future mental anguish and emotional distress suffered as a result of the decedent's death;

- loss of companionship and/or society (each category as appropriate for the specific category of wrongful death beneficiary) that they would have received from the decedent; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of the decedent's constitutional rights. Stephan Ross's actions and inaction showed a reckless or callous disregard of, or indifference to, the decedent's rights and safety. Moreover, Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

> ### D.    Cause of Action Against the County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

202.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, the County is liable to Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries, pursuant to 42 U.S.C. § 1983, for violating the decedent's rights constitutional rights, including those to reasonable medical/mental health care, to be protected, and/or not to be punished as a pre-trial detainee. These rights are guaranteed by at least the 8th and/or 14th Amendments to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

203.    The County acted or failed to act, through natural persons including Stephan Ross, under color of state law at all relevant times. The County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries.

204.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker(s) at the pleadings stage. Nevertheless, out of an abundance of

caution, the sheriff of the County was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the County jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker. Further, to the extent necessary and/or appropriate, Plaintiffs allege that final policy making authority was appropriately delegated. Despite these allegations, Plaintiffs rely on the court to apply the chief policymaker analysis at the appropriate juncture in this litigation.

205.    The County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above. It also acted in an objectively unreasonable manner. Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. The County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to the decedent.

206.    Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the administrator, from the County:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and/or

- the decedent's funeral expenses.

207.    Plaintiff(s) and Wrongful Death Beneficiaries also individually seek and are entitled to all remedies and damages legally available to each such person individually for the 42

U.S.C. § 1983 violations. They seek such damages as a result of the wrongful death of their respective son and father, as applicable. The County's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by these people, for which they individually seek compensation:

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered as a result of the decedent's death;

- future mental anguish and emotional distress suffered as a result of the decedent's death; and

- loss of companionship and/or society (each category as appropriate for the specific category of wrongful death beneficiary) that they would have received from the decedent.

Moreover, Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

IV.     Concluding Allegations and Prayer

    A.     Conditions Precedent

208.     All conditions precedent to assertion of all claims herein have occurred.

    B.     Use of Documents at Trial or Pretrial Proceedings

209.     Plaintiffs, Claimant Heirs, and Wrongful Death Beneficiaries intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

    C.     Jury Demand

210.    Plaintiffs, Claimant Heirs, and Wrongful Death Beneficiaries demand a jury trial on all issues which may be tried to a jury.

D.    Prayer

211.    For these reasons, Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries, as legally appropriate, ask that Defendants be cited to appear and answer, and that Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries, as legally appropriate, have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

a)    actual damages of and for Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries, including but not necessarily limited to:

- expenses for the decedent's funeral;

- the decedent's medical expenses;

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- past mental anguish and emotional distress suffered as a result of the decedent's death;

- future mental anguish and emotional distress suffered as a result of the decedent's death; and

- loss of companionship and/or society (each category as appropriate for the specific category of wrongful death beneficiary) that they would have received from the decedent;

b)    exemplary/punitive damages for Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries, from Stephan Ross;

c)      reasonable and necessary attorneys' fees for Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d)      court costs and all other recoverable costs;

e)      prejudgment and postjudgment interest at the highest allowable rates; and

f)      all other relief, legal and equitable, general and special, to which Plaintiff(s) individually, Claimant Heirs, and Wrongful Death Beneficiaries are entitled.

Respectfully submitted:


_____/s/ T. Dean Malone_____
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
jennifer.kingaard@deanmalone.com
Jordan A. Shannon
Louisiana State Bar No. 37868
jordan.shannon@deanmalone.com
Alexandra W. Payne
Texas State Bar No. 24118939
alexandra.payne@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:      (214) 670-9989
Telefax:          (214) 670-9904

Attorneys for Plaintiffs